# ERIC HAM *v.* JOSEPH GREENE ET AL.
## (SC 15806)

Borden, Berdon, Katz, Palmer and McDonald, Js.

Argued January 21—officially released May 4, 1999

*Martin S. Echter*, deputy corporation counsel, for the appellants (defendants).

*William S. Palmieri*, for the appellee (plaintiff).

*Opinion*

KATZ, J. The principal issue in this appeal is whether the trial court properly refused to set aside the jury verdict holding the defendants, New Haven police department detectives Joseph Greene and Michael Sweeney, liable for common-law malicious prosecution and false arrest claims and federal civil rights claims brought by the plaintiff, Eric Ham. After the jury found in favor of the plaintiff on each claim, the defendants filed a motion to arrest judgment, to set aside the verdict, to direct a verdict in their favor or for judgment notwithstanding the verdict, or, in the alternative, for a new trial or a remittitur. The trial court denied their motion and rendered judgment in accordance with the jury verdicts. The defendants appealed from the judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On January 20, 1991, a light colored station wagon containing two or three African-American males stopped in the vicinity of Sylvan Avenue and Ward and Asylum Streets in New Haven. A black male, approximately five feet five inches to five feet eight inches tall, with a dark complexion and a stocky build, stepped out of the automobile and fired approximately ten shots from a weapon into a crowd of people. He then got back into the vehicle and left the scene. There were two victims of the shooting: Markiest Alexander, age fourteen, who died as a result of the gunshot wounds; and Alfred Brown, age eighteen, who was seriously injured.

New Haven police responded to the scene. Greene was the detective assigned to investigate the shooting and was responsible for coordinating the investigation, locating and interviewing witnesses, retrieving and examining physical evidence, preparing police reports and reviewing reports of other police department members involved in the investigation. Sweeney was the supervisor of the investigation. Numerous witnesses identified through the defendants' investigation were taken to police headquarters that evening and interviewed by the defendants. They recovered, among other items, ten nine millimeter shells from the scene. Among those witnesses who gave separate tape-recorded statements to the defendants within hours of the shooting, were Ronald Hannans, Tashim Thomas, Terry Williams and Troy Carson.

Thomas, who had stood approximately thirty feet away from the shooter, described the shooter to the defendants as a dark skinned black male, approximately five feet eight inches tall, with a stocky build. Hannans told the defendants that he did not recognize the shooter, whom Hannans described as a black male approximately five feet seven inches tall. Carson told

the police that, moments before the shooting, he had seen a car with three black males cruising the area. He described the shooter as a dark skinned black male, approximately five feet seven inches to five feet eight inches tall with a stocky build. The male was dressed all in black. He could not identify the shooter beyond that physical description. Carson knew the plaintiff and told the police that he had seen him near the crime scene with a male named Timothy Davis. He stated that he saw the plaintiff and Davis only after the shooting had occurred and the police had arrived, as the two were leaving the area and as the crowd of onlookers was dissipating. Although Carson knew the plaintiff, he neither identified him as the shooter, nor suggested that the plaintiff was involved. Williams, who gave the same physical description of the shooter as the previous three witnesses, identified the weapon used as a "shiny nine millimeter."

On February 6, 1991, Tremaine Ortiz, another witness to the shooting, also described the shooter as a dark skinned black male, approximately five feet five inches tall with a medium build. Ortiz verified that the shooter had a uniquely shiny handgun and that a person named "Joe," who fit the description, was known for robbing drug dealers in the area where the shooting occurred.

Shortly after the evening of the shooting, the defendants interviewed Brown, the surviving victim. He told the police that his assailant was a black male, approximately five feet nine inches tall. Brown, who knew the plaintiff from school and the neighborhood, told the defendants that he did not recognize his assailant and, in fact, had never seen him before.

Nearly three weeks after the shooting, on February 6, 1991, the defendants interviewed Lynwood Cypress. Cypress described the shooter as a dark skinned black male, five feet five to five feet seven inches tall, with

a stocky build. He confirmed Williams' description of the weapon. Additionally, he advised the defendants that the shooter was the same person who had tried to rob him at gunpoint earlier that evening, shoving the same firearm into his stomach. Cypress was then transported to the police department where he gave a tape-recorded statement in which he repeated his earlier description of the shooter. Cypress believed that the shooter's name was Joe, but did not know the man's full identity. Finally, Cypress told the defendants that he had seen the same person two days after the shooting, but had not seen him in a while and therefore assumed that he was not from New Haven.

In contradiction to his earlier statements, on February 11, 1991, in his third statement to the defendants, Cypress stated that he personally knew the plaintiff and that the plaintiff was the shooter. He witnessed the plaintiff get out of a station wagon and open fire into a crowd of people on Sylvan Avenue. According to Cypress, the plaintiff was dressed in black pants, a black jacket, black shoes and a black hat and was carrying a nickel plated nine millimeter gun that he used to shoot the victims. The plaintiff thereafter got back into the car, which sped away. The vehicle was driven by someone named Joe, whom Cypress also recognized. He did not know the person in the back seat. The plaintiff and Joe returned moments later and stood in the crowd of onlookers for three to four minutes. According to this statement by Cypress, he and Carson stood close to the plaintiff and Joe, and Carson conversed with them.

Joseph Timothy Davis also gave a statement to the police in which he incriminated the plaintiff. He described how, on the day of the shooting, he and the plaintiff had been driving around in a station wagon that he had rented from someone in the neighborhood. According to Davis, they had stopped at the corner of Sylvan and Asylum Streets to talk with some friends,

when the plaintiff began playing with a nine millimeter gun he was carrying. The plaintiff leaned over Davis, and while he was tapping the weapon on the windowsill of the car, the gun discharged, and bullets ricocheted off the ground, striking two boys whom Davis knew from the neighborhood. Thereafter, they left the scene. In contradiction to every other witness as to the location of the shooter, in that statement, Davis reiterated that the plaintiff was seated in the car when the gun was fired. Following police questioning, Davis changed his story regarding the plaintiff's location, this time placing the plaintiff outside the vehicle during the shooting.

On January 28, 1991, the defendants learned from two inmates, one of whom was a relative of one of the victims, that an individual identified as Joe Covington, who was incarcerated at the New Haven Community Correctional Facility, was claiming responsibility for the shooting of Brown and Alexander. He had boasted to at least five people that he was responsible for the January 20, 1991 shooting. He provided details of the crime and how it had occurred. The defendants sent another policeman to interview two other inmates, George Galberth and Michael Gaetano, but they never interviewed Covington in connection with their investigation. Nor did they assign any other member of the police department to interview him or to show Covington's photograph to any of the witnesses.

On February 11, 1991, the defendants were given information that an individual named Tyrese White had shot Alexander and Brown. On the same date, the defendants received information from another source that an individual nicknamed "Ears" had had a dispute with Alexander two weeks before the shooting, and had threatened him at that time with a firearm. Neither lead was investigated. The defendants did, however, reinterview Carson that day. He repeated much of what he had already stated to the police on the evening of

the shooting. He reiterated that he could not identify the shooter beyond the physical description he had already provided, and that he had seen the plaintiff and Davis leaving the area of the shooting as the crowd of onlookers dissipated, only after the shooting had occurred and the police had arrived.

On February 12, 1991, Greene executed a search warrant at the plaintiff's household. The plaintiff, an eighteen year old black youth, six feet two inches tall, light skinned, and of slim build, weighing 155 pounds, was present at the time of the search. He had extensive contact with Greene, thereby allowing Greene carefully to observe the plaintiff and take note of his physical appearance. Pursuant to the warrant, the defendants seized one black army-type jacket, one brown empty pistol holster and one empty Remington .22 caliber bullet box.

On February 13, 1991, the defendants prepared and submitted an affidavit in support of a request for an arrest warrant for the plaintiff, charging him with murder in the first degree in violation of General Statutes (Rev. to 1991) § 53a-54a,[1] assault in the first degree in

---

[1] General Statutes (Rev. to 1991) § 53a-54a provides: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

violation of General Statutes (Rev. to 1991) § 53a-59[2]
and two counts of criminal use of a firearm in violation
of General Statutes § 53a-216.[3] Although it did not iden-
tify Cypress as the author, the affidavit prepared by the
defendants included information obviously taken from
Cypress' third statement, the one in which he incrimi-
nated the plaintiff. Their affidavit also included the con-
tents of the statement by Davis that he had been with
the plaintiff when the plaintiff shot the victims. The
warrant did not, however, include that portion of Davis'
earlier statement placing the plaintiff inside the vehicle
when the weapon discharged.

Additionally, the warrant did not include the fact that
Thomas, Carson and Hannans, neutral eyewitnesses to

[2] General Statutes (Rev. to 1991) § 53a-59 provides: "Assault in the first
degree: Class B felony. (a) A person is guilty of assault in the first degree
when: (1) With intent to cause serious physical injury to another person,
he causes such injury to such person or to a third person by means of a
deadly weapon or a dangerous instrument; or (2) with intent to disfigure
another person seriously and permanently, or to destroy, amputate or disable
permanently a member or organ of his body, he causes such injury to such
person or to a third person; or (3) under circumstances evincing an extreme
indifference to human life he recklessly engages in conduct which creates
a risk of death to another person, and thereby causes serious physical injury
to another person.

"(b) Assault in the first degree is a class B felony provided any person
found guilty under subdivision (1) of subsection (a) shall be sentenced to
a term of imprisonment of which five years of the sentence imposed may
not be suspended or reduced by the court."

[3] General Statutes § 53a-216 provides: "Criminal use of firearm or elec-
tronic defense weapon: Class D felony. (a) A person is guilty of criminal
use of a firearm or electronic defense weapon when he commits any class
A, B or C or unclassified felony as defined in section 53a-25 and in the
commission of such felony he uses or threatens the use of a pistol, revolver,
machine gun, shotgun, rifle or other firearm or electronic defense weapon.
No person shall be convicted of criminal use of a firearm or electronic
defense weapon and the underlying felony upon the same transaction but
such person may be charged and prosecuted for both such offenses upon
the same information.

"(b) Criminal use of a firearm or electronic defense weapon is a class D
felony for which five years of the sentence imposed may not be suspended
or reduced by the court."

the shooting, had told police that the shooter was five feet seven inches or five feet eight inches in height, with a dark complexion and a stocky build. Nor did the affidavit refer to Brown's statement. Although the warrant referred extensively to Cypress' incriminating statement, it failed to even mention the fact that he had given two previous statements, neither of which included an identification of the plaintiff as the shooter. Nor, therefore, did it include a reference to the fact that Cypress had first described the shooter as being a dark skinned black male, five feet five or six inches in height with a stocky build, or the fact that the shooter, known to him only as Joe, had tried to rob Cypress earlier on the day of the shooting. Further omitted from the affidavit was Cypress' statement that, although he had seen Joe two days after the shooting, he had not seen him for a long time and therefore assumed he was not from the area. Finally, the warrant also failed to mention Covington. Indeed, it did not include any reference to the two prison inmates who had reported to the police that Covington had boasted about being the shooter while providing details about the incident and its victims.

Based upon the affidavit prepared by the defendants, a warrant for the plaintiff's arrest was issued on February 13, 1991. The warrant was executed by the defendants that day, and the plaintiff was arrested and held in custody until May, 1991. On May 9, 1991, the criminal prosecution was nolled by the state because the two witnesses, Cypress and Davis, recanted their earlier statements implicating the plaintiff.[4] The charges there-

---

[4] At trial, Davis described how he had been taken to the New Haven police station where Greene intimidated and threatened him with prosecution. Davis related how Greene had told him falsely that the plaintiff had incriminated him in the shooting. Davis further testified that Greene, in effect, had told him what to say in his tape-recorded statement. Davis testified that in order to ensure his release, Davis had fabricated a story incriminating the plaintiff, which was included in the warrant affidavit. Davis further explained

after were dismissed by operation of law. See General Statutes § 54-142a.[5]

In August, 1991, the plaintiff brought this fifteen count complaint against the defendants, charging them each with federal civil rights claims pursuant to 42 U.S.C. §§ 1983 and 1988[6] for false arrest and malicious prosecution and with common-law claims of false arrest, malicious prosecution, intentional infliction of emotional

to the jury that on February 18, 1991, he recanted his statement incriminating the plaintiff. There was also evidence that the defendants were aware of the recantation.

[5] General Statutes § 54-142a provides in pertinent part: "Erasure of criminal records. . . . (c) Whenever any charge in a criminal case has been nolled in the Superior Court, or in the Court of Common Pleas, if at least thirteen months have elapsed since such nolle, all police and court records and records of the state's or prosecuting attorney or the prosecuting grand juror pertaining to such charge shall be erased. However, in cases of nolles entered in the Superior Court, Court of Common Pleas, Circuit Court, municipal court or by a justice of the peace prior to April 1, 1972, such records shall be deemed erased by operation of law and the clerk or the person charged with the retention and control of such records shall not disclose to anyone their existence or any information pertaining to any charge so erased, provided nothing in this subsection shall prohibit the arrested person or any one of his heirs from filing a petition to the court or to the records center of the Judicial Department, as the case may be, to have such records erased, in which case such records shall be erased. Whenever any charge in a criminal case has been continued at the request of the prosecuting attorney, and a period of thirteen months has elapsed since the granting of such continuance during which period there has been no prosecution or other disposition of the matter, the charge shall be construed to have been nolled as of the date of termination of such thirteen-month period and such erasure may thereafter be effected or a petition filed therefor, as the case may be, as provided in this subsection for nolled cases. . . ."

While § 54-142a has been amended since 1991, no changes were made to subsection (c).

[6] Title 42 of the United States Code, § 1983 (1994) provides: "Civil action for deprivation of rights

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress

distress and negligence. The defendants raised the special defenses of qualified immunity, governmental immunity, reliance upon advice of counsel and contributory and comparative negligence.

The case was tried to the jury, which returned a verdict in favor of the plaintiff as to both defendants. The verdict forms reflect the following awards against each of the two defendants: $100,000 compensatory damages for each of the two federal civil rights claims and $100,000 compensatory damages for each of the two common-law claims. Additionally, as indicated on the verdict forms, the jury awarded the plaintiff $200,000 in punitive damages against each of the two defendants for each of the two civil rights claims. The jury had been instructed by the trial court that there would be one award for compensatory damages and that its verdict form should reflect the total amount it considered appropriate. In the absence of any evidence indicating that separate types of compensatory damages should have been awarded based upon the different theories of liability, the trial court approved the total award of $100,000 for compensatory damages. Turning to the issue of punitive damages, the trial court concluded that there was a distinction between the two federal civil rights violations and, consequently, approved the total award of $800,000 in punitive damages in connection with those claims. With regard to punitive damages for the common-law claims, the trial court determined that the cost of litigation incurred to advance the state claims was proper. Using a fair hourly

applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

Title 42 of the United States Code, § 1988 (1994) provides in relevant part: "Proceedings in vindication of civil rights . . . (b) Attorney's fees

"In any action or proceeding to enforce a provision of sections . . . [§§ 1981 through 1983] . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. . . ."

rate of $150 per hour for 200 hours of work, the trial court awarded $30,000 additional punitive damages. The trial court denied the defendants' posttrial motions and rendered judgment for the plaintiff in the amount of $930,000. This appeal followed.

## I

The defendants argue that the trial court should have granted a directed verdict in their favor on the issue of qualified immunity. We begin with a discussion of our standard of review, followed by an examination of the applicable principles of substantive law.

"Our review of a trial court's refusal to direct a verdict or to render judgment notwithstanding the verdict takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial; *Bleich* v. *Ortiz*, 196 Conn. 498, 501, 493 A.2d 236 (1985); giving particular weight to the 'concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . .' *Chanosky* v. *City Building Supply Co.*, 152 Conn. 642, 643, 211 A.2d 141 (1965). The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion. *Bleich* v. *Ortiz*, supra, 500–501; *Pinto* v. *Spigner*, 163 Conn. 191, 192–93, 302 A.2d 266 (1972); *Chanosky* v. *City Building Supply Co.*, supra, 643." *Bound Brook Assn.* v. *Norwalk*, 198 Conn. 660, 667, 504 A.2d 1047, cert. denied, 479 U.S. 819, 107 S. Ct. 81, 93 L. Ed. 2d 36 (1986); see also *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988).

What is required to satisfy the defense of qualified immunity, which protects public officials from civil actions pursuant to § 1983 arising from the performance of their discretionary functions, is well settled. Although

§ 1983 on its face admits of no immunities; *Malley* v. *Briggs*, 475 U.S. 335, 339, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986); the United States Supreme Court has held that the qualified immunity defense protects government officials performing discretionary functions from liability for civil damages insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). [For purposes of a § 1983 claim] [w]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action . . . assessed in light of the legal rules that were clearly established at the time it was taken. *Anderson* v. *Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987) (citing *Harlow* [v. *Fitzgerald*, supra, 818–19]).

"A subjective inquiry into an official's personal belief is rejected in favor of an objective analysis of what a reasonable officer in [the] defendant's position would believe. In the context of an allegedly unconstitutional arrest, the objective reasonableness standard bars the defense of qualified immunity [o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable. *Malley* v. *Briggs*, [supra, 475 U.S. 344–45]. Thus, even where the law and the scope of permissible official conduct are clearly established, the defense of qualified immunity will protect a government official if it was objectively reasonable for him to believe his acts were lawful." (Internal quotation marks omitted.) *Cartier* v. *Lussier*, 955 F.2d 841, 843–44 (2d Cir. 1992).

"Plaintiffs may not unwrap a public officer's cloak of immunity from suit simply by alleging even meritorious factual disputes relating to probable cause, when those

controversies are nevertheless not material to the ultimate resolution of the immunity issue." Id., 845. As the *Cartier* court explained, and as the trial court in the present case recognized, in the context of a § 1983 claim, and for purposes of deciding whether to grant a motion for summary judgment or to direct a verdict, the determination of whether factual disputes are material to the resolution of the issue of qualified immunity is made by applying the same affidavit correction test used in a *Franks* hearing. See *Franks* v. *Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). Under that test, factual disputes are extraneous to the resolution of the issue of qualified immunity " 'if the affidavit accompanying the warrant is sufficient, after correcting for material misstatements or omissions, to support a reasonable officer's belief that probable cause existed.' " *Cartier* v. *Lussier*, supra, 955 F.2d 845, quoting *Magnotti* v. *Kuntz*, 918 F.2d 364, 368 (2d Cir. 1990). "Only if the corrected affidavit did not support an objective finding of probable cause would the factual disputes be material to resolving the issue of probable cause. In that case, summary judgment [appropriately would] be denied and [the] factual issues involving the immunity doctrine would be submitted to the jury." *Cartier* v. *Lussier*, supra, 845–46; see also *Velardi* v. *Walsh*, 40 F.3d 569, 574 (2d Cir. 1994); *Soares* v. *Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993).

Therefore, before taking the issue of qualified immunity away from the jury as a matter of law, the trial court must first determine that there are no material issues of fact relevant to the existence of probable cause. *Cartier* v. *Lussier*, supra, 955 F.2d 845–46. In order to be entitled to summary judgment or a directed verdict, "the officer must adduce sufficient facts that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was

objectively unreasonable for the officer to believe that probable cause did not exist." *Golino* v. *New Haven*, 950 F.2d 864, 870 (2d Cir. 1991), cert. denied, 505 U.S. 1221, 112 S. Ct. 3032, 120 L. Ed. 2d 902 (1992); see also *Mulligan* v. *Rioux*, 229 Conn. 716, 729, 643 A.2d 1226 (1994). "In other words, if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment [or a directed verdict]." *Lennon* v. *Miller*, 66 F.3d 416, 420 (2d Cir. 1995).

In this regard, the materiality of a misrepresentation or an omission is a mixed question of law and fact. *Golino* v. *New Haven*, supra, 950 F.2d 871. "The legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law. See *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). But the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases. See *Golino* [v. *New Haven*, supra, 871–72]; see also *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U.S. 438, 450, 96 S. Ct. 2126, 2132–33, 48 L. Ed. 2d 757 (1976). Nonetheless, if the evidence, viewed in the light most favorable to the plaintiffs, discloses no genuine dispute that a magistrate would have issued the warrant on the basis of the 'corrected affidavits,' then under the ordinary standard for summary judgment, see *Turtur* v. *Rothschild Registry International, Inc.*, 26 F.3d 304, 309 (2d Cir. 1994), a qualified immunity defense must be upheld." *Velardi* v. *Walsh*, supra, 40 F.3d 574.

In accordance with this well established precedent, the trial court in the present case, citing *Golino* v. *New Haven*, supra, 950 F.2d 870, first concluded that the defendants were entitled to qualified immunity as a matter of law only if, on the facts found, their conduct

either did not violate " 'clearly established . . . rights of which a reasonable person would have known,' " or "it was objectively reasonable for them to [have believed at the time of the challenged action] that their acts did not violate those rights . . . ." The right of an individual not to be subjected to arrest without probable cause has long been clearly established; id.; and was not disputed by the parties. Thus, the questions in this case were whether there were material factual disputes, and whether, applying the *Franks* test, the affidavit accompanying the warrant would have been sufficient, after correcting for material misstatements or omissions, to support a reasonable officer's belief that probable cause existed. As the trial court, citing to *Golino*, correctly explained, following any *Franks* corrections, in order for the defendants to prevail as a matter of law on the special defense of qualified immunity, it was incumbent upon them to prove that no reasonable juror, looking at all the evidence in the light most favorable to the plaintiff, could conclude that it was objectively unreasonable for the defendants to believe that probable cause did not exist.

Applying this well settled law to the facts of the present case, the trial court began with an evaluation of the material facts. Again, in deciding what facts were material, the court explained, quoting *Golino*: "Whether an item of information is material or not is, in the context of a motion for summary judgment, a mixed question of law and fact. . . . The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law. . . . The factual component requires an inference as to whether the information would likely be given weight by a person considering that question." (Citations omitted.) Id., 871.

Implementing this test, the trial court first concluded that the identity of the shooter was directly in issue.

Then it turned to the facts relating to that issue that had a bearing on whether the defendants had made a reasonable decision as to probable cause. The court then cited to the various factors that had been omitted from the affidavit. Specifically, the court noted that several neutral eyewitnesses to the shooting had told the police that the shooter was five feet seven inches tall, as compared to the plaintiff, who was well over six feet. The defendants also had failed to mention that the one unidentified person, referred to extensively throughout the affidavit—who knew the plaintiff, had witnessed the shooting, and had identified the plaintiff as the shooter—earlier had given two other statements in which he had described the shooter as someone he did not know, who was five feet five inches or five feet six inches tall and who wore a mask. The court noted that this description was corroborative of a statement by another witness to the shooting (Hannans), which also had been omitted from the affidavit. The trial court next examined Davis' statement. Davis, who had been quoted extensively in the affidavit, had first told police that the plaintiff had fired the gun from inside the car. That earlier statement did not find its way into the affidavit. Because this statement "would very likely [have been] given weight by a person seeking to determine probable cause since such a statement would [have] contradict[ed] every other witness to the shooting as to the location of the shooter and this witness' statement was important corroborative testimony to the only other key witness referred to in the affidavit who had identified the plaintiff as the shooter but who had first given two statements that had not implicated the plaintiff," the trial court concluded that such information was relevant to the probable cause determination under controlling substantive law. See *Anderson* v. *Liberty Lobby, Inc.*, supra, 477 U.S. 248.

Drawing upon similarities to the facts of *Golino*,[7] the trial court concluded that, "not only was there evidence that the [plaintiff was] not involved in the crime but the evidence actually relied on for probable cause statements from others was itself suspect—contradictory or inconsistent statements given by witnesses who actually tied the arrestee to the crime." Under such circumstances, the court determined that more than "mere impeachment material" was at stake,[8] and that the various matters that had not been included in the affidavit "were material because they were facts which 'would likely be given weight by a person considering the question' of probable cause."

We agree with the trial court that these omissions materially contributed to the objective basis for finding probable cause. As we have stated, "[a]lthough the ultimate determination of whether qualified immunity

[7] In *Golino* v. *New Haven*, supra, 950 F.2d 872, the trial court concluded that numerous facts had been withheld from the affidavit. In denying the defendants' motion in the present case, the trial court referred to some of the omitted facts in *Golino*, in particular: "[M]ost of the neutral eyewitnesses described the killer as thin and clean shaven whereas Golino was heavyset and wore a mustache. The person who said the killer had a mustache identified someone else and not Golino. The prime accuser made statements inconsistent with those she was referred to as having made in the warrant affidavit and recanted the statements attributed to her in the affidavit. Prints the police believed belonged to the killer did not match Golino. The police knew the killer's blood type but declined to test Golino for his blood type. [Id., 871–72]."

[8] The trial court distinguished the present case from *Cartier* v. *Lussier*, supra, 955 F.2d 841, wherein there "was fairly unimpeachable evidence from neutral sources that tied the suspect to the crime—an eyewitness with no knowledge of any of the parties who, right after the accident, gives a statement against the plaintiff, independent forensic evidence based on damage to the car and an accident reconstruction report. In a case such as that, contradictory statements from others, especially if they are from relatives or friends, are only 'impeachment' material in the *Brady* v. *Maryland* [373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] *State* v. *Pollitt* [205 Conn. 132, 531 A.2d 125 (1987)] sense and the qualified privilege would not be defeated if such facts were not included in the probable cause affidavit . . . ."

applies is ordinarily a question of law for the court, when, as in this case, there are unresolved factual issues *material* to the applicability of the defense . . . resolution of those factual issues is properly left to the jury. *Oliveira* v. *Mayer*, 23 F.3d 642, 649 (2d Cir. 1994); *Warren* v. *Dwyer*, [906 F.2d 70, 76 (2d Cir.), cert. denied, 498 U.S. 967, 111 S. Ct. 431, 112 L. Ed 2d 414 (1990)]." (Emphasis in original.) *Mulligan* v. *Rioux*, supra, 229 Conn. 736. "[W]hether a magistrate would have found probable cause if he had been presented with [*material*] truthful information . . . is a question of fact rather than of law." (Citation omitted; emphasis added.) *Velardi* v. *Walsh*, supra, 40 F.3d 574 n.1.

The trial court in the present case finally concluded that, although this was a "close case," it could not decide as a matter of law that there existed "no genuine dispute that a magistrate would have issued the warrant on the basis of the 'corrected affidavits . . . .' " Id., 574; see *Turtur* v. *Rothschild Registry International, Inc.*, supra, 26 F.3d 309. We cannot conclude as a matter of law that the probable cause calculus would not have been different or that the omitted information "could not possibly have affected the magistrate's decision to issue the warrant." *Velardi* v. *Walsh*, supra, 40 F.3d 574. Accordingly, after a thorough review of the extensive evidence presented in this case, we reject the defendants' claim that the trial court abused its broad legal discretion in declining to set aside the jury's verdict. *Palomba* v. *Gray*, 208 Conn. 21, 24, 543 A.2d 1331 (1988).

II

In this next issue on appeal, the defendants claim that the trial court improperly denied their motions to set aside the verdict and for judgment notwithstanding the verdict. This claim is, to a large degree, intertwined with the first claim. Distilling the defendants' claims to

their essence, and putting aside the defendants' complaint, raised for the first time in this appeal, that the trial court's instruction on materiality was deficient; see footnote 12 of this opinion; they argue that there was no basis in law for the verdicts because, "[u]nder both state and federal law, an arrest warrant does not give rise to civil liability unless probable cause to arrest no longer exists after correction for material omissions and/or for material falsehoods associated with the arrest warrant affidavit" and because there was no basis in the evidence for the jury to have concluded that any such material omissions or falsehoods resulted from their intentional action or reckless disregard.

In accordance with the aforementioned discussion, we conclude that the trial court acted within its discretion in allowing the jury to consider the constitutional claims of false and unreasonable arrest and malicious prosecution. There were factual disputes concerning the police conduct that bore directly on whether the defendants had knowingly or recklessly made a false statement or omitted material information that was necessary to a finding of probable cause. The jury was properly instructed to resolve these factual disputes and to decide whether, based upon its findings, the information omitted or misrepresented would likely have been given weight by the magistrate considering the request for the warrant.[9] The jury's verdicts reflect its answer that, more probably than not, no warrant would have issued based upon the corrected affidavit.

---

[9] The defendants argue that, with regard to the issue of probable cause, because a judge had signed a warrant authorizing the plaintiff's arrest, "only the malicious prosecution claim may even be considered . . . ." This is incorrect. A review by a trier of fact of the corrected affidavit differs from a probable cause determination by a magistrate on the basis of affidavits that contain material omissions. The magistrate's signature does not, in and of itself, insulate the defendants when there is a genuine dispute about material facts. Consequently, it is proper for the jury to evaluate the issue of probable cause as it relates to the false arrest claims.

Considering the evidence, including reasonable infer-
ences that may be drawn therefrom, in the light most
favorable to the plaintiff, and giving particular weight
to the concurrence of the judgments of the judge and
the jury, who observed the witnesses and heard the
testimony, we cannot conclude that the trial court
abused its discretion in refusing to set aside the verdict
and direct judgment in the defendants' favor. *Mather*
v. *Griffin Hospital,* supra, 207 Conn. 130.[10]

### III

The defendants next raise nine additional claims that
pertain to their liability. Seven of these claims have not
been briefed adequately,[11] and one was not preserved

---

[10] With regard to the common-law claims of malicious prosecution and
intentional infliction of emotional distress, the defendants argue that this
court in *Mulligan* v. *Rioux,* supra, 229 Conn. 727–30, improperly distin-
guished between the standards for qualified immunity to common-law claims
of malicious prosecution and civil rights claims of malicious prosecution.
Specifically, the defendants expressly invite this court to abandon its recent
decision and to adopt instead the objective reasonableness standard in the
context of state law claims arising out of allegedly unlawful arrests and
prosecutions. We decline their invitation.

[11] The defendants have claimed the following improprieties: (1) the trial
court's admission of the statements of Brown (a victim of the shooting) and
the testimony and statements of Galberth and Gaetano (the two inmates
who heard Covington's incriminating statements) was improper; (2) the
search warrant was improperly admitted into evidence because it undoubt-
edly confused the jury; (3) the court improperly refused to allow police
officer Andrew Faggio to testify about Davis' statement to him that a contract'
was out on his life; (4) the court improperly allowed into evidence the sales
slip for the automobile claimed to have been used in the shooting; (5)
the court improperly limited the scope of the plaintiff's cross-examination
regarding statements he had made in connection with his arrest for falsely
reporting an incident; (6) the court improperly disallowed the defendants
to offer a statement by Ortiz that he knew the plaintiff to be the shooter
but that he would not identify him because he wanted to get revenge on
the plaintiff himself; and (7) the trial court improperly refused to grant the
defendants' motion for mistrial after Davis "blurted out" before the jury
that he had taken a polygraph test.

These claims were briefed in as equally a perfunctory a fashion as they
have been stated herein. Rather than analyze the trial court's reasoning with
regard to any of these claims, the defendants merely assert, in a conclusory

at trial for appellate review.[12] We consider and reject the one claim that is properly before this court.

The defendants claim that the trial court improperly allowed Davis to testify as a rebuttal witness. They recognize that whether to allow rebuttal testimony is a matter of discretion. See *Shaham* v. *Capparelli*, 219 Conn. 133, 134, 591 A.2d 1269 (1991). Nevertheless, they claim that it was improper in this case to allow the testimony because "the plaintiff could not have prevailed on a motion for directed verdict at the close of the plaintiff's case without such testimony." We disagree.

After Sweeney testified regarding Davis' interview, the plaintiff called Davis as a rebuttal witness, over the

manner, that the trial court acted improperly. Consequently, they do not merit review. Practice Book § 67-4; *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 38, 717 A.2d 77 (1998) (issues not adequately briefed may be deemed abandoned); see also *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 300, 589 A.2d 337 (1991); *Gaynor* v. *Union Trust Co.*, 216 Conn. 458, 482, 582 A.2d 190 (1990).

[12] The defendants claim that the trial court failed to give proper guidance regarding the meaning of exculpatory information and materiality. This claim was not raised properly at trial. The defendants expressly informed the court, following its charge to the jury, that they had no objections to the charge. As we have repeatedly stated, issues not properly raised before the trial court will ordinarily not be considered on appeal. Practice Book § 60-5. "We have referred to the policy reasons underlying the preservation requirement on several occasions. The policy serves, in general, to eliminate the possibility that: (1) claims of error would be predicated on matters never called to the attention of the trial court and upon which it necessarily could have made no ruling in the true sense of the word; and (2) the appellee . . . would be lured into a course of conduct at the trial which it might have altered if it had any inkling that the [appellant] would . . . claim that such a course of conduct involved rulings which were erroneous and prejudicial to him." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 48, 717 A.2d 77 (1998).

Recognizing the problem of preservation, the defendants claim that "[t]his omission by the court is plain error." We reject this claim. First, "[o]nly in the most exceptional circumstances will this court consider a claim that was not raised in the trial court." Id., 48 n.42. Second, the defendants do not brief why the claim merits such extraordinary review. Rather, once again, the brief provides but a summary statement supporting the claim.

defendants' objection, to describe how the defendants had threatened him and had told him falsely that the plaintiff had implicated him in the shooting. This testimony did indeed follow the defendants' motion for a directed verdict. The trial court, however, deferred ruling on that motion until after the jury had returned with its verdict. The trial court, citing to *Wood* v. *Bridgeport*, 216 Conn. 604, 607, 583 A.2d 124 (1990), expressly stated in its memorandum of decision on the posttrial motions that it had not considered Davis' rebuttal testimony in reaching its decision. Therefore, the imagined prejudice to which the defendants point did not materialize.

### IV

The defendants raise four issues pertaining to damages. They assert that the trial court improperly: (1) allowed the jury to consider damages for the plaintiff's lost educational opportunities; (2) allowed the jury to award multiple punitive damages; (3) awarded punitive damages in connection with the common-law claims; and (4) failed to grant a remittitur. We reject these claims.

### A

In its instructions on the issue of compensatory damages, the trial court told the jury that, in assessing non-economic damages, it could consider the plaintiff's claim that his wrongful incarceration had interfered with his plans to attend school. The defendants claim that, because the plaintiff never attempted to reenroll at the University of Connecticut, and in fact went to Gateway Community College, and because he was unable to attend school for at least three months in 1993, when he was incarcerated on another matter, the aforementioned instructions were improper. The defendants failed, however, to preserve this claim. Indeed, on the contrary, they expressly informed the court at the conclusion of its charge that they had no

objections. Therefore, this claim is unpreserved. As we have stated repeatedly, issues not properly raised before the trial court will ordinarily not be considered on appeal. Practice Book § 60-5. In the absence of any assertion as to why this issue may warrant review under the plain error doctrine, we decline to consider it. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 48, 717 A.2d 77 (1998).

## B

The defendants next claim that the trial court improperly allowed the jury to award multiple punitive damages. Specifically, they claim that the trial court should not have allowed the jury to award punitive damages for both constitutional violations. Rather, they contend that the award should have been limited to $200,000 against each defendant "for the combined violations of federal false arrest and federal malicious prosecution . . . ." This would have resulted in an award of $400,000, rather than $800,000.

The plaintiff argues in response that: (1) this claim was not properly preserved at trial; and (2) separate awards of punitive damages with respect to each aspect of a defendant's conduct were proper because "the constitutional torts of false arrest and malicious prosecution compensate a plaintiff for different harm . . . ." See *Singer* v. *Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995) ("[t]ypically, a warrantless deprivation of liberty from the moment of arrest to the time of arraignment will find its analog in the tort of false arrest . . . while the tort of malicious prosecution will implicate post-arraignment deprivations of liberty" [citation omitted]); *Hygh* v. *Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (damages may be awarded for false arrest for period from initial custody until arraignment, and subsequent damages from continued incarceration are attributable to malicious prosecution). We agree with

the plaintiff's first response and, therefore, do not address the merits of the claim.

In its instructions regarding compensatory damages, the trial court told the jury that, if it reached a verdict in favor of the plaintiff, it was to put a figure on each of the verdict forms that represented the *total* amount of compensatory damages it deemed appropriate. Punitive damages were, however, to be treated differently. The jury was told expressly that whatever figures it put on each of the verdict forms used for the constitutional claims would be added together by the court afterwards.

The defendants did not object to the instructions to the jury allowing it to consider separate punitive damage awards for each of the two constitutional claims.[13]

---

[13] Additionally, we note that on February 28, 1996, the defendants moved for a directed verdict after the plaintiff's case, after their own case, and again on March 1, 1996, after the plaintiff's rebuttal, but failed each time to raise the issue of punitive damages. On February 16, 1996, the defendants filed their request to charge, which also neglected to address the issue raised herein.

"We recognize that a trial court has the inherent authority to set aside a verdict even where no motion to set aside the verdict has been filed. See, e.g., *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 206, 579 A.2d 69 (1990); *State* v. *Avcollie*, 178 Conn. 450, 455, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980); *Belchak* v. *New York, N. H. & H. R. Co.*, 119 Conn. 630, 637, 179 A. 95 (1935). This does not mean, however, that [the defendants] need not have raised issues arising during the trial, in a motion for a directed verdict, in order for the appellate tribunal to review the trial court's denial of a motion to set aside the verdict. See W. Gallagher, Post-trial Motions (1980) p. 22 ('an absolute prerequisite to the motion under Section 321 is the filing of the motion for directed verdict'). In *Avcollie*, the defendant had filed a motion for directed verdict, thus properly alerting the court to the issue. *State* v. *Avcollie*, supra, 455. In *Belchak*, the verdict was set aside because it was inconsistent, as a matter of law, with the jury's answers to interrogatories, an issue that could not have been raised during the trial. *Belchak* v. *New York, N. H. & H. R. Co.*, supra, 632–33. In *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, supra, 206, we noted the trial court's inherent authority to set a verdict aside but did not reach the issue of whether such action was proper when no motion for directed verdict had been filed." *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 49–50 n.44.

Nor do they argue that this court should review the claim as a matter of plain error. See Practice Book § 60-5. "Only in the most exceptional circumstances will this court consider a claim that was not raised in the trial court." *Cahill* v. *Board of Education,* 187 Conn. 94, 99, 444 A.2d 907 (1982). The issue first arose in the defendants' posttrial motions. The trial court cited relevant factual distinctions between the two federal constitutional violations, which the jury reasonably could have relied upon in its award.[14] On the basis of our review of the record and the federal case law addressing this issue, we conclude that the trial court's ruling did not constitute plain error.

## C

In their third claim, the defendants argue that the trial court improperly awarded punitive damages for the common-law claims. Specifically, they claim that the punitive damages award in connection with the common-law claims was unfair because the punitive

---

In this case, the defendants' failure to raise this issue before the case was submitted to the jury precluded the trial court from addressing this question in a timely fashion. Specifically, had the issue been raised and had the trial court agreed with the defendants, there would have been an opportunity to allow the jury to mechanically treat punitive damages similarly to compensatory damages but nevertheless to award $800,000.

[14] Specifically, in this regard, the trial court drew the following distinctions: "[T]he court believes what is relevant is the distinction between the two federal constitutional violations. For malicious prosecution the jury need only find that the police knew or should have known there was no probable cause for a person's arrest. As to this element a jury could find it established even if a policeman had a sincerely held suspicion a person was guilty of a crime but procured his arrest knowing there was no probable cause for it. On a false arrest claim under the facts of this case the jury was instructed and could be taken to have found from their verdict that the officers submitted a warrant to a judge knowing the affidavit contained material omissions or misleading assertions. That is an entirely different and added finding which this court cannot conclude the jury had no right to attach some significance to and thus could not take into account in awarding punitive damages on each federal constitutional claim."

damages award of $800,000 more than fairly compensated the plaintiff. Additionally, they assert that the award of attorney's fees to which the plaintiff is entitled is limited to the amount awarded on the federal claims under 42 U.S.C. § 1988 (b).[15] The record contains the following additional relevant facts.

As the verdict forms reflect, and in accordance with the trial court's instructions, the jury determined that punitive damages should be awarded in connection with the state law violations. The amount of those damages was, however, to be left to the trial court to determine. The court acknowledged that the plaintiff was a party to a retainer agreement with counsel providing that the fee would be 40 percent of any recovery, but cautioned that, "[i]n light of the court's instructions on how state and federal punitive damages were to be calculated by the jury, the court tends to agree that if the retainer agreement were to be used to determine the amount of state punitive damages there would be a double recovery or at least the danger of such a recovery being imposed without any fair way to determine if in fact that were the case." Additionally, the court recognized that the $100,000 compensatory damage award was made on both the state and federal claims, and that there was no way to apportion the award as between them. Thereafter, the court reasonably decided to avoid these problems by relying on the costs of litigation as the means by which to determine the amount of state punitive damages. See *Berry* v. *Loiseau*, 223 Conn. 786, 831, 614 A.2d 414 (1992).

The court then set a rate of $150 per hour as fair compensation. There had been a claim by plaintiff's counsel that 248.80 hours had been dedicated to the present case. The question of how many hours reasonably had been devoted to the state claims was recognized, but no satisfactory answer could be readily

---

[15] See footnote 6 of this opinion.

ascertained. The court then concluded that 200 hours was a reasonable time for the prosecution of the state claims and determined the punitive damage award to be $30,000.

On appeal, the defendants essentially make two claims. First, they claim that the trial court improperly awarded counsel fees in connection with the state claims because the identical conduct gave rise to the federal claims for which the plaintiff will be entitled to counsel fees pursuant to federal statute. The plaintiff, however, has not made any request thus far for counsel fees in connection with the federal claims. The court specifically noticed that such claim had not been made, that the subject award would not preclude the court from awarding additional attorney's fees on the federal claims, and that the court "at the end of these proceedings should be careful not to make a double award for the costs of litigation." Additionally, we note that the decision whether to award fees under § 1988 is discretionary. "In any action or proceeding to enforce a provision of . . . [§§ 1981 through 1983] . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988 (b). Consequently, the issue of whether the award is duplicative is not properly before the court, and indeed, may never be an issue before this tribunal.

The defendants' second claim is that the award of $800,000 in federal punitive damages more than fairly compensated the plaintiff. Our treatment of this issue is subsumed in our discussion in part IV D of this opinion.

D

Finally, the defendants claim that the trial court should have granted a remittitur because the jury award was excessive. The law in this area is well settled, and

we do not attempt today to improve upon our recent decisions in this regard.

"Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . This right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court. . . . The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption. . . . In considering a motion to set aside the verdict, the court must determine whether the evidence, viewed in the light most favorable to the prevailing party, reasonably supports the jury's verdict. . . . The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be indulged in favor of its correctness. . . . This is so because [f]rom the vantage point of the trial bench, a presiding judge can sense the atmosphere of a trial and can apprehend far better than we can, on the printed record, what factors, if any, could have improperly influenced the jury. . . . It is the function of this court to determine whether the trial court abused its discretion in denying [a defendant's] motion to set aside the verdict." (Citations omitted;

internal quotation marks omitted.) *Mather* v. *Griffin Hospital,* supra, 207 Conn. 138–39.

In the present case, the trial court recognized that the award was sizeable, but concluded that it was not one that "shocks the conscience." Concluding that there were "absolutely no guidelines to be used in [disturbing the award] except the judge's personal predilections as to what would be fair or appropriate," the court declined to remit any portion of the awards. We do not find that the trial court abused its discretion.

The judgment is affirmed.

In this opinion BORDEN, BERDON and PALMER, Js., concurred.

MCDONALD, J., dissenting. I disagree with the majority's determination that the jury reasonably could have found that the defendants lacked probable cause to arrest the plaintiff. "[W]hether particular facts . . . constitute probable cause is always a question of law"; *Vandersluis* v. *Weil,* 176 Conn. 353, 356, 407 A.2d 982 (1978); and therefore our review is plenary. Under this standard, I would hold that there was insufficient evidence for the jury to find that the defendants lacked probable cause to arrest the plaintiff. Accordingly, I would remand the case with direction to render judgment for the defendants on all counts of the plaintiff's complaint.

The lack of probable cause is a critical element of both the plaintiff's malicious prosecution claim and false arrest claim under common law; see, e.g., id. (tort of malicious prosecution); *Beinhorn* v. *Saraceno,* 23 Conn. App. 487, 491, 582 A.2d 208 (1990), cert. denied, 217 Conn. 809, 585 A.2d 1233 (1991) (tort of false arrest); and under 42 U.S.C. § 1983; see *Ricciuti* v. *New York City Transit Authority,* 124 F.3d 123, 128, 130 (2d Cir.

1997) (federal civil rights claims for malicious prosecution and false arrest); *Singer* v. *Fulton County Sheriff*, 63 F.3d 110, 117–18 (2d Cir. 1995) (same). In making a finding of probable cause, the trial court must determine "whether the . . . evidence [offered] would warrant a person of reasonable caution to believe that the accused [had] committed the [charged offense]." (Internal quotation marks omitted.) *In re Keijam T.*, 221 Conn. 109, 115, 602 A.2d 967 (1992). "Evidence is not required to rise to a significant level of trustworthiness in order to meet the probable cause standard." *State* v. *Lewis*, 245 Conn. 779, 808, 717 A.2d 1140 (1998). "The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear [t]hat there is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances." (Internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992).

The issue in this case is whether the affidavit submitted by the defendants in support of their application for an arrest warrant, if corrected by adding the information omitted, and looking at the evidence in a light most favorable to the plaintiff's case, supports a reasonable belief that probable cause did not exist. See *Cartier* v. *Lussiter*, 955 F.2d 841, 845 (2d Cir. 1992) ("[a]fter the affidavit has been corrected in a light most favorable to the plaintiffs . . . if there remains an objective basis supporting probable cause, no constitutional violation of [the plaintiff's] Fourth Amendment rights has occurred").[1] Therefore, the plaintiff's case can succeed only "where the warrant application is so lacking in

---

[1] *Cartier* concerned whether the trial court in that case should have granted the defendant's motion for summary judgment, which was based on the defendant's assertion of qualified immunity. *Cartier* v. *Lussiter*,

indicia of probable cause as to render official belief in its existence unreasonable . . . ." *Malley* v. *Briggs*, 475 U.S. 335, 344–45, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

Applying this standard, I would conclude that, under an interpretation of the evidence most favorable to the plaintiff, the affidavit established probable cause. It is undisputed that the affidavit provided that two eyewitnesses, Lynwood Cypress and Joseph Timothy Davis, identified the plaintiff as the assailant who murdered one victim and wounded the other. Cypress, who was not identified by name in the affidavit, stated that, approximately thirty minutes before the shooting, the plaintiff, his friend "Joe" and another black male were driving around the area in an older model, beige, Datsun station wagon with wood like side panels and a luggage rack on top. According to the affidavit, Cypress stated that the vehicle had stopped near Sylvan Avenue and Ward Street in New Haven. Five to six black males were walking down the street, with their backs to the plaintiff, when the plaintiff, who had exited the vehicle, started shooting at them. Cypress stated that the vehicle then left the area, but that the plaintiff and Joe returned to the area of the shooting on foot approximately ten minutes later. According to Cypress, the plaintiff was wearing a black ski cap, a black army type jacket and black pants. The affidavit also provided that, after obtaining a search warrant for the plaintiff's residence, the police found and seized one black army type jacket, one brown empty pistol holder and one empty Remington .22 caliber bullet box.

While police were at the plaintiff's residence, Davis, approached the defendants and agreed to give a statement about the incident. According to the affidavit,

---

supra, 955 F.2d 842. The same principles apply, however, to the question before this court today, namely, whether the trial court should have granted the defendants' motion for a directed verdict or judgment notwithstanding the verdict.

Davis stated that he had known the plaintiff for over eleven years and that they were very good friends. On the day of the shooting, Davis was the driver of the beige station wagon, the plaintiff was a passenger in the front seat, and a man named James sat in the back-seat. Davis stated that he stopped the vehicle in the area of Sylvan Avenue and Ward Street and that the three men got out of the vehicle. According to Davis, the plaintiff was playing with a nine millimeter handgun when it accidentally discharged numerous times, hitting the victims. Davis stated that the plaintiff immediately got back into the vehicle and told Davis to drive away quickly. The police previously had located and seized the described vehicle on Hamilton Street in New Haven. Davis further stated that he and the plaintiff went back to the scene of the shooting on foot to see if anyone was hurt.

The facts alleged in the affidavit were sufficient to establish probable cause for the plaintiff's arrest. The identification of the plaintiff as the shooter by both Cypress and Davis, and the consistencies in their accounts, clearly established probable cause. Additionally, Davis' statement that he drove the getaway car was against his interest and, therefore, reliable. See, e.g., *State* v. *Barton*, 219 Conn. 529, 551, 594 A.2d 917 (1991). The information omitted from the affidavit, given an interpretation most favorable to the plaintiff, only establishes that: (1) Cypress made two statements to the police before incriminating the plaintiff in his third statement; and (2) Davis initially had stated that the plaintiff fired the pistol from inside the vehicle but later had stated that the plaintiff was outside the vehicle when he fired the gun. Neither of these revelations nor the varied identifications of the gunman by other witnesses sufficiently impugns the probable cause established by the defendants. "Once a police officer has a reasonable basis for believing there is probable

cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti* v. *New York City Transit Authority*, supra, 124 F.3d 128.

If the criminal case against the plaintiff had gone to trial and he had been convicted for the shootings, an appellate court would hold that there was sufficient evidence for the jury reasonably to conclude that the plaintiff had committed the offenses charged. If both Cypress and Davis had testified in accordance with their statements, and had been cross-examined as to the omitted discrepancies, and if the plaintiff had produced witnesses with contrary testimony, the jury reasonably could have believed that the plaintiff was the shooter despite any contrary evidence. Even if Cypress and Davis refused to testify in accordance with their statements and recanted their identification of the plaintiff as the shooter, their written and signed or recorded statements of identification would be admissible as substantive evidence at trial. See, e.g., *State* v. *Woodson*, 227 Conn. 1, 20–21, 629 A.2d 386 (1993); *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). This would be sufficient evidence for a jury to convict the plaintiff for the shootings. See *State* v. *Newsome*, 238 Conn. 588, 612–19, 682 A.2d 972 (1996).

While I conclude that probable cause existed for the plaintiff's arrest, I also would hold that the defendants are protected from the plaintiff's civil rights claims by the doctrine of qualified immunity. "An arresting officer is entitled to qualified immunity from a suit for damages on a claim for arrest without probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." (Internal quotation marks omitted.) *Lee* v. *Sandberg*, 136 F.3d 94, 102 (2d Cir.

1997). Thus, "[t]he issue for immunity purposes is not probable cause in fact but arguable probable cause." (Internal quotation marks omitted.) Id., quoting *Myers* v. *Morris*, 810 F.2d 1437, 1455 (8th Cir.), cert. denied, 484 U.S. 828, 108 S. Ct. 97, 98 L. Ed. 2d 58 (1987).

The trial court observed that the existence of probable cause in this case was a "close call." The doctrine of qualified immunity is intended to protect officers in these precise situations, in which the officers must make discretionary decisions that are close calls. "[O]fficers must frequently make credibility determinations in deciding whom to arrest, and imposing liability in circumstances like the ones present here would hamstring law enforcement efforts to a degree not only unfair to the individual officer but grossly destructive of the public welfare." *Stigall* v. *Madden*, 26 F.3d 867, 869 (8th Cir. 1994). I would conclude in this case that the defendants have qualified immunity.

The result in this case only further endangers our cities, already beset by the kind of random, violent crime that terrifies witnesses and renders effective law enforcement very difficult. The breakdown of social control of violent crime creates an atmosphere in which the law abiding citizen cannot remain. The very survival of our cities is, in this sense, endangered by upholding this nearly one million dollar verdict against detectives faced with an onslaught of violence and reluctant witnesses. The majority's opinion, holding police detectives liable for performing their duties in a reasonable manner, leads to substantial detrimental effects on society, "ranging from an inability to attract qualified candidates to serve in public positions, to a diversion from the discharge of official duties and towards the avoidance of litigation, to inhibiting the zealous performance of official obligations." *Cartier* v. *Lussiter*, supra, 955

F.2d 844. Accordingly, I dissent from such a chilling and repressive result, which violates the constitutional duty of a state to ensure domestic tranquility.