**Jermaine REESE, Plaintiff,**

v.

**Richard GARCIA and Kevin Mingo, Individually and in their Official Capacities as State Police Troopers, Defendants.**

**No. 3:99CV1436 (GLG).**

United States District Court,
D. Connecticut.

Sept. 27, 2000.

Gary A. Mastronardi, Bridgeport, CT, Matthew J. Broder, Cousins & Johnson, Stamford, CT, for Plaintiff.

Stephen Richard Sarnoski, Attorney General's Office, Hartford, CT, for Defendants.

## OPINION

GOETTEL, District Judge.

This civil rights action is brought by plaintiff, JERMAINE REESE, against two Connecticut State Troopers, RICHARD GARCIA and KEVIN MINGO, in their individual and official capacities, for malicious prosecution and false arrest under state law and under 42 U.S.C. § 1983 for violating plaintiff's constitutional rights under the Fourth Amendment.[1] Plaintiff has also asserted a state-law claim for intentional infliction of emotional distress. This Court has previously dismissed all claims against defendants in their official capacities, as well as plaintiff's state-law claim for negligence. Defendants have now moved for summary judgment. [**Doc.** # 19]. For the reasons discussed below, defendants' motion will be DENIED IN PART AND GRANTED IN PART.

### BACKGROUND

On or about August 10, 1998, at approximately 2:35 p.m., an altercation between seven to eight black males broke out in front of the Bridgeport Superior Courthouse. During this altercation, an individual named Dante Jones was approached on the Courthouse steps by approximately seven black men who began beating him

and dragged him off the steps into the street. While on the ground, the victim was kicked and beaten. At one point, one of the individuals involved in the altercation pulled a handgun from his waistband and shot and killed Jones. The men ran from the site of the shooting, scattering in different directions.

Between August 10, 1998, and August 13, 1998, the Connecticut State Police undertook an investigation into the shooting. State Police Trooper Garcia was assigned to the investigation and Trooper Mingo assisted in certain aspects of the investigation.

On August 13, 1998, defendant Garcia prepared an affidavit in support of a warrant for the arrest of plaintiff, Jermaine Reese. Based upon this affidavit, a State Superior Court Judge issued a warrant for plaintiff's arrest for the murder of Dante Jones. Plaintiff was arrested and incarcerated on the charge of murder. On or about May 6, 1999, plaintiff was acquitted by a Superior Court jury. Plaintiff then filed the instant lawsuit against Troopers Garcia and Mingo.

### I. The Objective Existence of Probable Cause

█ In support of his constitutional claims and claims for false arrest and malicious prosecution, plaintiff invokes his "long established right" to be "free from arrest ... in the absence of probable cause." *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997). For purposes of this motion, this right can be particularized as "the right to be free from an arrest based on a warrant that would not have been issued if the officer seeking the warrant had disclosed to the issuing magistrate information within the officer's knowledge that negated probable cause." *Brown v. D'Amico,* 35 F.3d 97, 99 (2d Cir.1994). "Though an officer need not

---

1. Although plaintiff has also identified the Fourteenth Amendment as a source of his constitutional rights to be free from false arrest and malicious prosecution, the Second

Circuit has held that the Fourth Amendment is the appropriate source for § 1983 cases involving such claims. *Lennon v. Miller,* 66 F.3d 416, 423 n. 2 (2d Cir.1995).

volunteer every fact that arguably cuts against the existence of probable cause, the officer may not omit circumstances that are critical to the evaluation of probable cause." *Id.* Both sides agree that the issue of probable cause lies at the heart of plaintiff's false arrest and malicious prosecution claims, whether asserted under state law or as federal constitutional violations.

Here, plaintiff claims that defendants[2] were guilty of material omissions in the affidavit that was submitted to obtain a warrant for his arrest in that they never alerted the judge to certain "facts" which, according to plaintiff, would have vitiated the finding of probable cause had they been included in the arrest warrant affidavit. Specifically, plaintiff contends that the following material facts were omitted from the affidavit:

1. On August 10, 1998, the date of the shooting, Garcia did not include the fact that an eyewitness, Angelo Rivera, gave a statement to Garcia identifying the shooter as a black male, approximately 5′03″ to 5′06″ tall and weighing between 120 and 140 pounds. The plaintiff is a black male, approximately 6′04″, weighing about 220 pounds. Garcia states that he considered unreliable Rivera's estimation of the shooter's height and weight because Rivera had changed his estimate from the first interview to the second.[3] Also, Rivera observed the shooter from a distance of approximately 100 feet and was standing uphill from the shooter, whom he described as bending over the victim. Garcia conclud-

ed that from this vantage point the shooter would appear shorter than he actually was. However, Garcia credited Rivera's description of the shooter's clothing since his observations would not have been affected by the position from which he viewed the shooting.

2. On August 10, 1998, shortly after the shooting, Tarrell Young, a fourteen-year-old eyewitness to the shooting, was interviewed by defendant Mingo. Young identified the shooter as having sideburns connected to a goatee, which description Garcia included in the affidavit. He did not include the "fact" that plaintiff claims not to have had sideburns or a goatee on the day of the shooting. Garcia states that he had no knowledge of this "fact," and this was a physical characteristic that plaintiff could readily change.

3. Young also told Mingo that the shooter wore his hair like "Jamaicans do." Following this statement, Young was shown a photospread that contained eight photographs of young black males, one of whom was the plaintiff. Plaintiff was the only one that had his hair in corn-rows. Young identified the photograph of Jermaine Reese as the shooter. However, Garcia omitted from his affidavit the fact that Reese was the only one with corn-rows and that Young had previously identified plaintiff as wearing his hair like "Jamaicans do." Garcia states that he believed that the photospread was

**2.** As discussed below, although plaintiff alleges all claims against both defendants Garcia and Mingo, their involvement with the investigation of this murder case and preparation of the affidavit for the arrest warrant was quite different. Therefore, we will refer to the defendants individually, except where it is appropriate to refer to them collectively in the plural.

**3.** The first time Garcia interviewed Angelo Rivera, Rivera described the shooter as plain-

tiff claims, 5′3″ to 5′6″ tall and weighing 120 to 140 pounds. The second time Garcia interviewed Rivera on August 12, 1998, Rivera changed the height description, and estimated that the shooter was between 5′6″ and 5′8″ tall. In either instance, Rivera's description of the shooter was significantly different that plaintiff's actual height and weight. Rivera described a relatively small man whereas plaintiff at 6′4″ was more than a foot taller than Rivera's lowest estimate and nearly 100 pounds heavier.

valid and not unduly suggestive and saw no reason to include in his affidavit a statement that plaintiff was the only one with corn rows in his hair. The photospread was created using the Bridgeport Police Department's automated system. The photographs were of black males of similar age and build to plaintiff.[4]

4. Neither Mingo or Garcia ever obtained a height description of the shooter from Young, an eyewitness, despite prior descriptions of the shooter as a relatively short, thin person.[5]

5. On August 11, 1998, an individual named Stacey Erskine gave a sworn signed statement to Garcia in which she informed him that her brother, Barrington Erskine, had confessed to her that he had shot Dante Jones. Garcia did not include Stacey Erskine's account of her brother's confession because Garcia considered her brother's confession unreliable. On August 11, 1998, Stacey Erskine told Officer DeCesare that her brother said he had killed Jones and discarded the murder weapon in a sewer grating near the Courthouse. The State Police thoroughly searched all of the sewer gratings in the area and did not locate a weapon. That same day, Trooper DeCesare and Trooper Elmendorf interviewed Barrington Erskine, who admitted being at the Courthouse the day of the murder, but denied any involvement with the crime. The troopers questioned his truthfulness and Garcia, along with another officer, interviewed him again the following day at which time he provided more details about his activities at the Courthouse that day and his observations of Jones' murder. He identified Jermaine Reese as someone he had seen on the Courthouse steps and then just inside the Courthouse in a heated argument with an individual named Travis Satawhite. Reese told Satawhite to come outside because he was going to "f——him up" for killing his boy (a gang brother). Reese left the Courthouse and Erskine then saw Reese and several other black men in the street beating up the victim, Dante Jones. Erskine identified

4. While Mingo was at the police department, a woman named Vinessa Thomas called stating that her son, Tarrell Young, had witnessed the murder. Mingo agreed to interview Young. Before leaving for the interview, Mingo obtained the photospread, which was in color. Mingo noticed that Reese was the only one wearing an orange shirt and he was concerned that this called too much attention to his picture, so he changed the photographs to black and white. When Mingo interviewed Young, who had witnessed the shooting from his mother's car parked outside the Courthouse, Young provided a description of the suspect, although Mingo cannot recall whether or not Young gave a height and weight description, or whether he even asked him for it. Young also told Mingo that he believed that he recognized the shooter and the other men who beat the victim as from his neighborhood and he was confident that he could identify the shooter if he saw a photograph of him. When Mingo showed Young the black and white photospread, he told him that a picture of the shooter was not necessarily in the array. After reviewing the photospread for 30 to 40 seconds, Young picked out the picture of Reese as having been the person he saw shoot the victim in front of the Courthouse. Mingo's written statement taken from Young and his report were part of the investigative report filed by Garcia.

5. During an evidentiary hearing in April, 1999, Young testified that the shooter's height was well under six feet. Upon seeing Reese, Young confirmed that the shooter was not as tall as Reese and added that the person standing in front of him in the courtroom did not appear to be the same person he had identified in the photospread. At this time, Reese did not have his hair in corn rows. Of course, this information was not available to Garcia at the time he prepared his affidavit and made a determination of probable cause. Therefore, it is irrelevant to his probable cause determination. *See McBride v. City of New Haven*, 3:97CV1475AWT, 2000 WL 559087, at *2 (D.Conn. Mar. 30, 2000)(stating that the "pivotal" issue is what defendants knew at the time they made their probable cause determination).

Reese as tall, about 6'2" and having his hair braided in corn rows. He did not see who shot Jones. Plaintiff asserts that information obtained from Courthouse employees casts doubt on the believability of Barrington Erskine's account. According to the two deputy sheriffs on duty at the Courthouse, the altercation between Reese and Satawhite occurred not at 2:30 p.m., as Erskine indicated, but around 11:50 a.m. This information was not included in the affidavit, and according to plaintiff, clearly raised serious questions about the believability of Erskine's unbroken chain of events story because either Erskine was lying or never actually saw what he described. On August 13, 1998, Garcia and another Trooper again interviewed Erskine, who explained that he was "playing" with his sister when he hold her he had murdered Jones. He gave additional details of what he had observed at the time of the shooting, which again placed Reese at the scene. Garcia further states that Erskine's clothing did not match the descriptions of the shooter's clothing provided by others. Plaintiff, however, describes Barrington Erskine as of Jamaican descent, approximately 5'6" tall and weighing approximately 140 pounds. Plaintiff also described Erskine as frequently wearing his hair in corn rows and having sideburns and a goatee.

6. Garcia also omitted the fact that Angelo Rivera had picked Barrington Erskine's photo out of a photospread as an individual who was present on the street and involved in the incident at the time of the shooting. Garcia stated that this information was not included because, again, he did not think it was reliable. When Rivera was shown the photographs, he had merely picked out three photographs of individuals (one of whom was Erskine), stating that they "looked familiar" and "could have been" involved in the shootings. Two of the three photographs he picked out were "wild cards" not involved in any way with the incident. Thus casting doubt on his identification of Erskine.

7. On or about August 13, 1998, an individual named Jermaine Gray gave a statement to the Connecticut State Police in which he stated that he had witnessed the shooting from a position inside the front doors of the Courthouse. He identified Jermaine Reese as the murderer. Although Gray's statement was included in Garcia's affidavit, plaintiff states that Garcia did not include material information from the two deputy sheriffs posted in the Courthouse foyer that nobody was in the foyer area by the front doors at the time of the shooting.[6] Plaintiff claims that this information was readily available to Garcia. Garcia states that he did not include this information from the two deputy sheriffs because he was not aware of it. The deputies who had been working the metal detector at the Courthouse had been interviewed and indicated that just before the shooting, three black men ran into the Courthouse. Two remained inside, while one of them, later identi-

---

**6.** The two Sheriffs were John Gallup and Anthony Urbanovsky. Gallup was working at the metal detector at the front door at the time of the shooting. Three men ran up the stairs of the Courthouse and attempted to go through the metal detector without stopping. He stopped them and, after two went through the metal detector into the lobby of the Courthouse, the other one went outside. About one to two minutes later, he heard shots. There had been no altercation in the lobby just prior to the shooting. He did not see the scuffle in front of the Courthouse because of the location of his duty station. Urbanovsky stated that he saw the scuffle on the Courthouse steps but he was not aware of any incidents occurring inside the Courthouse prior to the shooting.

fied as the victim, went back outside. The shooting occurred shortly thereafter and neither deputy was able to identify the two men who were in Courthouse nor did they indicate precisely where the two men were standing at the time of the shooting.

8. Plaintiff further states that defendant Garcia knowingly and intentionally included in the arrest affidavit unreliable information from Jermaine Gray and Robin Fernandez. Both identified plaintiff as the shooter. Plaintiff states that Garcia knew or through the most cursory investigation should have known that the information provided by Gray and Fernandez was absolutely false. Plaintiff asserts that it was well known to Garcia that Gray and Fernandez were good friends of Satawhite, with whom plaintiff had an earlier altercation, and with the victim, Dante Jones. The altercation between Reese and Satawhite would have provided a compelling motive for Gray and Fernandez to fabricate their stories at Satawhite's urging that the shooter was Jermaine Reese. Additionally, plaintiff claims that Fernandez' version of the facts suffers from the same deficiencies as Gray's version because the altercation that she describes occurred at 11:50 a.m., not 2:30 p.m., and there was no continuum between the earlier altercation between Satawhite and Reese and the slaying of Dante Jones. He suggests that the similarity in their two stories may have resulted from someone "feeding" them information about events at the Courthouse that day. Garcia asserts that he had no reason to believe this information was false. Both witnesses had been interviewed on several occasions and gave factual accounts that were at least partially corroborated by other witnesses. Moreover, examination of the court docket indicated that Reese had a case in court on the day of the shooting and that Reese had appeared.

Defendants assert that under federal and Connecticut law, the defendants' alleged failure to alert the judge to the foregoing "facts" was not material because there would have been probable cause for the arrest even if the omitted information had been included.

 Probable cause to arrest exists under federal law when "the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991), *cert. denied sub nom., Lillis v. Golino*, 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992). Similarly, under Connecticut state law, probable cause "comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." *State v. Barton*, 219 Conn. 529, 548, 594 A.2d 917 (1991) (internal citations and quotations omitted). The quantum of evidence required to establish probable cause to arrest need not reach the level necessary to support a conviction and, thus, the fact that plaintiff was ultimately acquitted of the crime for which he was arrested does not mean that probable cause was lacking for his arrest. *See Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir.1989). In determining whether the necessary quantum of evidence existed to support a finding of probable cause, the Court is required to evaluate the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In making this determination, the Court must consider those facts available to the officer at the time of the arrest. *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir.1996).

Defendants argue, and plaintiff agrees, that the overall approach to be utilized by this Court in deciding whether the omitted information was material to a finding of

probable cause is set forth in the Second Circuit's decision in *Smith v. Edwards*, 175 F.3d 99 (2d Cir.1999). According to *Smith*, the first step in assessing the materiality of such omissions is to "correct" the allegedly defective affidavit by inserting the information withheld from the Superior Court Judge who issued the arrest warrant. *Id.* The second step is for this Court to then decide "whether as a matter of law [the corrected affidavit] did or did not support probable cause." *Id.* "If probable cause remains, no constitutional violation of the plaintiff's Fourth Amendment rights has occurred." *Id.* In such a case, any disputed factual issues cannot be deemed "material," and summary judgment is warranted. However, if the corrected affidavit does not support an objective finding of probable cause, then the Court should conclude that material factual disputes prevent summary judgment for the defendant. *Cartier v. Lussier*, 955 F.2d 841, 845–46 (2d Cir.1992).

██ Once the affidavit[7] is corrected by adding the above-referenced information that was known or reasonably should have been known to defendant Garcia at the time he completed the affidavit, and the resulting document is viewed in the light most favorable to the plaintiff as the non-moving party, it now contains the following additional information:

1. Rivera's description of the shooter as 5'3" to 5'6" and 120 to 140 pounds, whereas plaintiff was 6'4" and 220 pounds;

2. A qualification that Young's identification of Reese from the photospread was made after Young had told Mingo that Reese had hair like Jamaicans and that Reese was the only individual with corn rows in the photospread;

3. Further elaboration on Barrington Erskine's account of the altercation between Satawhite and Reese; that this was not part of a continuum that began around 2:30 p.m.; that

Erskine had confessed to his sister that he had shot Jones, although no weapon had been found and he later withdrew this confession; that Rivera had identified Erskine as having been at the scene, although he also incorrectly identified two others; and that plaintiff's description of Erskine physical appearance was similar in many respects to Rivera's and Tarrell Young's descriptions of the shooter;

4. Further explanation of the relationship between Gray and Fernandez and Satawhite and the victim and the fact that Fernandez's story about the altercation between Reese and Satawhite was not part of a continuum of events; and

5. Reports from the Courthouse Sheriffs that the altercation between Reese and Satawhite had occurred just before noon, not at 2:30, that there was no altercation in the foyer to the Courthouse just prior to the shooting, and that no one was standing in that location at the time of the shooting.

Additionally, the affidavit would still contain the following information, which is presented here in summary fashion:

6. That an anonymous witness who worked near the Courthouse overheard one of the victim's friends identify plaintiff as the person who killed Jones;

7. Garcia's confirmation that Reese had been in Court that day;

8. The statement of Steskla, who worked for the Department of Corrections, that the man standing over the victim was 5'10" tall, wearing a black T-shirt and black pants, with a black hat, round in shape, possibly military style and holding a black and silver handgun;

---

**7.** The affidavit is submitted as an exhibit to the Motion for Summary Judgment. Because

of its length, we do not include the complete text of the affidavit in this ruling.

9. Rivera's account of the shooting and that the assailant was wearing a dark blue shirt, dark blue baseball cap, and blue jeans and that he had a silver handgun;

10. Several witnesses placing Jermaine Reese and others at the Courthouse around the time of the shooting;

11. Ksaun Young (Jones' cousin) relating Satawhite's account of the murder (Satawhite would not cooperate with the police). Satawhite had told Young that Jermaine Reese and Reggie Reese had threatened to kill him that day at the Courthouse. Satawhite said that members of the Foundation Gang, of which plaintiff was a member, had been pointing fingers at Satawhite, stating that they were going to kill him. Young went to the Courthouse and observed members of the Foundation Gang. He took Jones' car and went for help (friends to help if a fight broke out). When he returned, Jones had been shot. Satawhite told him that after a fight broke out on the Courthouse steps between Jones and Reese, the Reese's Foundation Gang joined in, beating up Jones. According to Satawhite, Reese then ran to his car, took out a gun, and began shooting at Jones;

12. Erskine's identification of Jermaine Reese and several others, who were known to him, beating the victim;

13. Robin Fernandez' identification of Jermaine Reese and Reggie Reese as two of the men fighting with Jones, following an altercation that had begun inside the Courthouse and had also included Satawhite, and her statement that she saw plaintiff get a gun from his car and shoot Jones five times;

14. Jermaine Gray's identification of Jermaine Reese and Reggie Reese as being involved in the fight with Jones and his observation from the Courthouse lobby of plaintiff's shooting Jones; and

15. Plaintiff's criminal record.

Having "corrected" the affidavit to include the alleged material omissions, the Court must now determine whether, based upon the totality of the circumstances, the affidavit as corrected supports a finding of probable cause for plaintiff's arrest. *Smith,* 175 F.3d at 105. Defendants argue that we should find as a matter of law that probable cause still exists. We cannot agree.

The Second Circuit has held that whether particular information is relevant to an assessment of probable cause is a legal determination to be made by the Court, whereas it is for the trier of fact to decide what weight a neutral judge or magistrate would have assigned to such relevant information. *Id.* at n. 5. As the Court in *Smith* noted, although this formulation promotes jury trials in "doubtful cases," summary judgment remains appropriate where there can be no "genuine dispute" that a the neutral judge issuing the warrant would have issued the warrant based on the "corrected affidavit." *Id.* (citing *Velardi v. Walsh,* 40 F.3d 569, 574 (2d Cir. 1994)). Thus, in the context of a motion for summary judgment, the materiality of a misrepresentation or an omission is a mixed question of law and fact. *Golino,* 950 F.2d at 871.

In the instant case, the Court finds that some of the omitted information was relevant to the assessment of probable cause, whereas other omitted items were not relevant. In particular, we find that Rivera's statements regarding the shooter's height and weight were relevant and should have been provided to the Superior Court Judge for his consideration in determining whether there was probable cause for plaintiff's arrest. Although there were minor discrepancies in Rivera's estimates between his first and second interviews, in either case his estimates significantly differed from plaintiff's actual height and weight. Rivera's description of the shooter was of a

small man, both in terms of height and weight. Plaintiff is a large man, as much as a foot taller than the man Rivera described and weighing 100 pounds more. Although Rivera's vantage point may explain these discrepancies to some degree, we find it doubtful that it would account for this large a disparity. Another witness had described the shooter as 5'10" and of thin build. Obviously, height and weight descriptions were extremely relevant to the identity of the shooter. *See Ham v. Greene,* 248 Conn. 508, 524–25, 729 A.2d 740, *cert. denied,* —— U.S. ——, 120 S.Ct. 326, 145 L.Ed.2d 254 (1999)(finding that the omission of several neutral eyewitnesses' descriptions of the shooter as 5'7" tall, as compared to the plaintiff who was well over 6', was relevant to the probable cause determination).

We also find that the potential bias of Erskine, Fernandez, and Gray, who were friends with the victim and with Satawhite, with whom plaintiff had an earlier altercation in the day, was relevant to the Judge's evaluation of their credibility and whether they had a possible motive for framing plaintiff. In fact, their stories, which seemed to describe a continuum of events, appear to have been in error in this regard and raise suspicions as to whether someone else provided this information to them. However, the weight that the Superior Court Judge would have given the potential bias of these witnesses is a question that must be decided by the trier of fact.

Additionally, in light of Tarrell Young's unequivocal identification of plaintiff's photograph from the photospread, which may have carried significant weight in the probable cause determination, it was relevant to disclose that only one of the pictured individuals had corn rows. This one feature may very well have been the identifying feature that this fourteen-year-old witness used to identify plaintiff. However, we do not find relevant the alleged omission that plaintiff did not have sideburns connected to a goatee on the day of the shooting, as Young described the shooter. As defendant Garcia stated, this is a physi-

cal characteristic that can be changed with the swipe of a razor.

We also find relevant Stacy Erskine's statement that her brother had confessed to the murder. The defendants questioned Barrington Erskine exhaustively and concluded that this was not reliable information. However, the officers noted his nervousness during the interviews and plaintiff's description of Barrington Erskine is strikingly similar to two witnesses' description of the shooter. Similarly, we find relevant Rivera's identification of Erskine as having been at the scene.

In deciding this motion for summary judgment, we are required to view the evidence in the light most favorable to the plaintiff. After a thorough review of the extensive record in this case and considering the totality of the relevant evidence, we find a genuine issue of material fact as to whether the Judge would have issued the arrest warrant based upon the corrected affidavit. The weight to be given these omissions, which the Court has found to be legally relevant to the probable cause determination, is an issue for the trier of fact. This is a close case. The Second Circuit has cautioned that in doubtful cases, summary judgment is inappropriate. *Velardi,* 40 F.3d at 574; *Golino,* 950 F.2d at 871–72. Because we cannot conclude as a matter of law that the probable cause calculus would not have been different or that the omitted information "could not possibly have affected the [Judge's] decision to issue the warrant," *Velardi,* 40 F.3d at 574, we must deny summary judgment to defendant Garcia.

■ Although the parties do not focus on the different roles played by defendants Garcia and Mingo in this case, we view their roles as significantly different. Trooper Mingo's sole involvement was obtaining the photospread from the Bridgeport Police Department, which photospread was generated by a computer (although he did appropriately exercise his discretion to have the photospread in black and white rather than in color be-

cause of the potential for prejudice due to plaintiff's prominent orange shirt) and he took a statement from witness Young, including Young's identification of plaintiff from the photospread. Mingo did not prepare the affidavit that led to plaintiff's arrest and there is no indication that he exercised any input or discretion with respect to what information would be contained in the affidavit and what would be omitted. We find no facts in the record that would support plaintiff's claims against defendant Mingo. Mingo did not participate in the arrest of plaintiff and, therefore, cannot be liable under Connecticut common law for false arrest. *See Beinhorn v. Saraceno,* 23 Conn.App. 487, 582 A.2d 208 (1990), *cert. denied,* 217 Conn. 809, 585 A.2d 1233 (1991). Additionally, there is no evidence that Mingo initiated the criminal proceedings against plaintiff or that he participated in any way in the criminal prosecution of plaintiff and, therefore, he cannot be liable for malicious prosecution. *See Mulligan v. Rioux,* 229 Conn. 716, 731–32, 643 A.2d 1226 (1994)(a cause of action for malicious prosecution requires allegations that the defendant initiated or procured the institution of criminal proceedings against the plaintiff). Similarly, plaintiff's Fourth Amendment claims for false arrest and malicious prosecution against defendant Mingo must fail.[8].

## II. The Qualified Immunity Defense

Alternatively, defendants argue that they are entitled to qualified immunity for their decision not to include the information in the warrant. (Having dismissed plaintiff's claims against defendant Mingo, we need not consider the merits of Mingo's

qualified immunity defense). Qualified immunity is an affirmative defense that the defendant has the burden of raising in his answer and establishing at trial or by a motion for summary judgment. *In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir.1996). The fact that we have found genuine issues of material fact as to plaintiff's substantive claims is not dispositive of the question of whether defendant Garcia is entitled to summary judgment on his qualified immunity defense. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)(stating that it is "inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and … in such cases those officials— like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable"); *see also Oliveira v. Mayer,* 23 F.3d 642, 648–49 (2d Cir.1994)(noting that the inquiry into the lawfulness of the defendant's action is not the same as the inquiry into qualified immunity), *cert. denied,* 513 U.S. 1076, 115 S.Ct. 722, 130 L.Ed.2d 627 (1995). Even where a plaintiff's federal rights were clearly established at the time of the alleged violation, a defendant may still enjoy qualified immunity if it was objectively reasonable for him to believe that his actions did not violate those rights. *Lennon v. Miller,* 66 F.3d at 422.

The Supreme Court and Second Circuit have encouraged the use of summary judgment when qualified immunity is raised as a defense. *See Harlow v. Fitzgerald,* 457 U.S. 800, 815–16, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993).

---

**8.** Neither side addresses plaintiff's claim for intentional infliction of emotional distress, which we view as a very weak state-law claim given the facts of this case. Since defendants have not moved for summary judgment on this count, we will not address the substantive merits as it relates to defendant Garcia. However, since we are dismissing all of plaintiff's state-law and constitutional claims against defendant Mingo, we also dismiss his claim for intentional infliction of emotional

distress claim. There simply are no facts in the record to support a claim that defendant Mingo's conduct was so extreme and outrageous as to exceed all bounds of decency. *See Vorvis v. Southern New England Telephone Co.,* 821 F.Supp. 851, 855 (D.Conn.1993), (*citing Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986)); *DeLaurentis v. City of New Haven,* 220 Conn. 225, 266–67, 597 A.2d 807 (1991).

■ In a section 1983 action, qualified or "good faith" immunity shields a police officer sued in his individual capacity from liability for damages on account of his performance of discretionary official functions if (a) the officer's actions did not violate clearly established law, or (b) it was objectively reasonable for the officer to believe that his actions did not violate such law. *Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. 3034; *Harlow v. Fitzgerald,* 457 U.S. at 818–19, 102 S.Ct. 2727; *Lauro v. Charles,* 219 F.3d 202, 214 (2d Cir.2000); *Lennon v. Miller,* 66 F.3d at 420; *Golino,* 950 F.2d at 870. The right not to be arrested without probable cause has long been a clearly established right, and defendant does not contend otherwise. *Cook v. Sheldon,* 41 F.3d 73, 78 (2d Cir.1994). Thus, we focus solely on the second prong of the qualified immunity test, that is whether it was objectively reasonable for defendant Garcia to believe that his actions did not violate that right or whether officers of reasonable competence could disagree on whether the probable cause test was met. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "In order to be entitled to summary judgment on such a defense, the officer must adduce sufficient facts that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively unreasonable for the officer to believe that probable cause did not exist." *Golino,* 950 F.2d at 870 (citing *Malley,* 475 U.S. at 341, 106

S.Ct. 1092). "In other words, if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment." *Lennon v. Miller,* 66 F.3d at 420.

We stress that the qualified immunity test is an objective one. "A subjective inquiry into an official's personal belief [has been] rejected in favor of an objective analysis of what a reasonable officer in [the] defendant's position would believe. In the context of an allegedly unconstitutional arrest, the objective reasonableness standard bars the defense of qualified immunity '[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable.' *Malley v. Briggs,* 475 U.S. at 344–45, 106 S.Ct. 1092." *Cartier,* 955 F.2d at 843.

■ Normally, the issuance of an arrest warrant by a neutral judge or magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officer to believe that there was probable cause, and a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden. *Golino,* 950 F.2d at 870. Here, however, plaintiff contends that defendant Garcia knowingly and intentionally omitted material information from the affidavit and the omission of this information was necessary to a finding of probable cause.[9] *See Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Where an officer knows, or has reason to know, that he has materially

---

**9.** As the *Cartier* court explained, in the context of a § 1983 claim and for purposes of deciding whether to grant a motion for summary judgment, the determination of whether factual disputes are material to the resolution of the issue of qualified immunity is made by applying the same affidavit correction test used in a *Franks* hearing. *See Franks v. Delaware,* 438 U.S. at 171–72, 98 S.Ct. 2674. Under that test, factual disputes are extraneous to the resolution of the issue of qualified immunity " 'if the affidavit accompanying the warrant is sufficient, after correcting for material misstatements or omissions, to support

a reasonable officer's belief that probable cause existed.' " *Cartier v. Lussier,* 955 F.2d at 845 (quoting *Magnotti v. Kuntz,* 918 F.2d 364, 368 (2d Cir.1990)). "Only if the corrected affidavit did not support an objective finding of probable cause would the factual disputes be material to resolving the issue of probable cause. In that case, summary judgment [appropriately would] be denied and [the] factual issues involving the immunity doctrine would be submitted to the jury." *Cartier,* 955 F.2d at 845–46; *see also Velardi v. Walsh,* 40 F.3d at 574; *Soares v. Connecticut,* 8 F.3d 917, 920 (2d Cir.1993).

misled the judge who issued the warrant, as where a material omission is intended to enhance the contents of the warrant affidavit, the shield of qualified immunity is lost. *Golino,* 950 F.2d at 871 (citing *Malley,* 475 U.S. at 344–45, 106 S.Ct. 1092).

Whether an item of information is material or not is, in the context of a motion for summary judgment on qualified immunity grounds, a mixed question of law and fact. The legal component depends on whether the information is relevant to a given question in light of controlling substantive law; the factual component requires an inference as to whether the information likely would have been given weight by the neutral magistrate or judge. *Golino,* 950 F.2d at 871 (citing *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

█ In this case, in ruling on defendant's motion for summary judgment on plaintiff's substantive claims, we have already engaged in this analysis and found that some, but not all, of the omitted items were relevant. We also found that factual issues were presented as the weight to be given these items and whether a neutral judge would still find probable cause based on the corrected affidavit. Likewise, we find that there are genuine issues of material fact as to whether any reasonable officer would believe that there was probable cause for plaintiff's arrest once the omitted information is added to the affidavit and all facts are viewed in the light most favorable to the plaintiff. We are particularly disturbed by the significant discrepancies in the physical description of the shooter. *See Golino,* 950 F.2d at 871 (denying summary judgment on qualified immunity grounds where the affidavit omitted the fact that most witnesses described the killer as thin, whereas the plaintiff weighed 215 pounds); *see also Ham v. Greene,* 248 Conn. at 524, 729 A.2d 740. Additionally, it appears that this incident may have been gang related. There were at least seven or eight individuals involved. There was at least the potential for bias in the accounts of some of the witnesses who were members of rival gangs, or who had previous encounters with plaintiff. According to several witnesses, on the day of the shooting, plaintiff and members of the Foundation Gang had threatened Satawhite, who was a friend of the victim and was with the victim just prior to the shooting. Thus, there was reason to question some of the witnesses' identification of plaintiff as the shooter. Moreover, the identification of plaintiff's photograph by Tarrell Young, a neutral witness, may well have been tainted by the fact that plaintiff was the only one pictured with corn rows.

Although the issue of qualified immunity should be decided by the Court as a matter of law, that is true only when the facts concerning the availability of the defense are undisputed; otherwise, jury resolution is normally required. *Oliveira,* 23 F.3d at 649. If any reasonable trier of fact could find that the defendant's actions were objectively unreasonable, then the defendant is not entitled to summary judgment. *Lennon v. Miller,* 66 F.3d at 420. In this case, we find genuine issues of material fact in that regard. Based upon the record before us, we are unable to find that no reasonable jury, looking at all the evidence in the light most favorable to the plaintiff, including the affidavit corrected, could conclude that it was objectively reasonable for the defendant Garcia to believe that probable cause existed for plaintiff's arrest for the murder of Dante Jones.

Therefore, we must deny summary judgment in favor of defendant Garcia on his qualified immunity defense.

## CONCLUSION

Accordingly, the motion for Summary Judgment of Defendant Garcia is DENIED in all respects. The Motion for Summary Judgment of Defendant MINGO is GRANTED as to all Counts of Plaintiff's Complaint.

SO ORDERED.